## Case No. 5,401.
### GIBSON v. STEVENS.
[3 McLean, 551.] [1]

Circuit Court, D. Indiana. May Term, 1845.[2]

INDEBITATUS ASSUMPSIT — WHEN IT WILL LIE.— FRAUD—TROVER—WAREHOUSE RECEIPT —LIEN—ATTACHMENT.

1. Money fraudulently obtained from a bank may be sued for before the note given to the bank, for the same, becomes due.

2. A forged note to the bank is no payment, and the bank may sue for the money advanced by it.

3. An action of trover for the bank notes, or for the property purchased with them, would have been the proper action. But, in such a case an action of indebitatus assumpsit will lie.

4. A suit for the original consideration, disregarding the fraudulent note, is not, in fact, an affirmance of the contract.

5. A receipt by the warehouse man for property to be forwarded to order and of payment, when assigned to a commission merchant, who makes an advance, does not create a lien on the property, paramount to that of an attachment laid before notice of the assignment.

[See note at end of case.]

6. The money advanced, not being equal to the value of the property, leaves an attachable interest, beyond the lien, if it exist, of the commission merchant.

7. On the attachment all the creditors may come in, under the Indiana statute.

[This was an action of replevin by Edmund J. H. Gibson against Bradford B. Stevens.]

Judah & Baird, for plaintiff.
Morrison & Mason, for defendant.

OPINION OF THE COURT. This cause is submitted to the court, on facts agreed, substantially as follows: M'Queen and M'Kay, of Detroit, Michigan, about the 20th of March, 1844, by false pretences fraudulently procured the bank at Indianapolis, to loan to them the sum of about $11,000 in notes of the bank, payable to bearer. With part of this money M'Queen and M'Kay purchased of Hanna, Hamilton & Co. 350 barrels of mess pork, for the sum of $2,908.50, and received from them the following memorandum: "Fort Wayne, April 4th, 1844. Messrs. M'Queen & M'Kay, bought of Hanna, Hamilton & Co. 350 bbls. mess pork, to be delivered on board of canal boats soon after the opening of canal navigation. Received payment in full. Hanna, Hamilton & Co. We guaranty the inspection of the above pork at Toledo, and the delivery on board of canal boats at this place. (Fort Wayne,) soon after the opening of canal navi-

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Reversed in 8 How. (49 U. S.) 384.]

gation. Hanna, Hamilton & Co." At the time of this purchase, the barrels of pork were in the warehouse of the said Hanna, Hamilton & Co., at Fort Wayne, Indiana, on the Wabash and Erie Canal, marked and branded "Mess Pork," together with a large number of other barrels of pork marked "Prime Pork" and "Clear Pork." There were no other barrels at that or any subsequent time marked "mess pork" in said warehouse. The barrels were not seen by M'Queen & M'Kay, they being intermixed with other barrels. At the same time, M'Queen & M'Kay purchased with a part of the money obtained as aforesaid, 200 barrels of flour, and received the following memorandum: "Fort Wayne, April 4, 1844. Messrs. M'Queen & M'Kay bought of D. & J. A. T. Nichols 200 bbls. superfine flour @ $3,56¼, $712.50. Received, Fort Wayne, April 4, 1844, payment in full. D. & J. A. T. Nichols. Received the above flour in store at Fort Wayne, April 4, 1844, which we agree to deliver on board canal boats here, soon after the opening of navigation, subject to the order of M'Queen & M'Kay. D. & J. A. T. Nichols. We guaranty the inspection of the above flour in New York, as superfine flour;" signed as above. This flour, when purchased, was in the warehouse of the said Nichols, at Fort Wayne. On the 17th of April, 1844, M'Queen & M'Kay, on the presentation of the above memoranda to Gibson, the plaintiff, in the city of New York, a commission merchant, procured an advance on the same of $2,787.50, and M'Queen & M'Kay by indorsements thereon of the above date, directed the pork and flour to be delivered to the plaintiff or his order. On the same day, M'Queen & M'Kay wrote and handed to Gibson the following letter: "New York, 17th April, 1844. Messrs. Ludlow & Babcock, Gentlemen: We have this day received an advance from E. T. H. Gibson, Esquire, on the following lots of pork, which you will have the goodness to deliver to his order, and to comply with his instructions relative to shipments, viz: 355 bbls. mess pork; 225 bbls. prime pork, from warehouse of Walker, Rogers & Co.; 11 bbls. mess, at Benbridge & Mix's warehouse; 300 barrels mess at Hamilton & Williams' warehouse; 350 bbls. mess at Hamilton, Hanna & Co.'s warehouse; 200 bbls. flour at D. & J. A. T. Nichols' warehouse." On the succeeding day Gibson enclosed the above letter in one written by himself and directed to Mott & Co., Toledo, Ohio, which was received in the due course of the mail, and the above letter of M'Queen & M'Kay which was enclosed, was received by Ludlow & Babcock, at Toledo. On the same day Gibson wrote to Ludlow & Babcock, that he had made to M'Queen & M'Kay an advance on 1250 barrels of pork and 200 barrels of flour, which were stored at different points on the line of the Wabash Canal, and which they state "is to be shipped to your care and held by you at Toledo, until you receive instruction from them respecting it. They have given me an order on you for

it, which I have sent to Mott & Co. I wish you to ship the pork and flour to me immediately on its arrival at Toledo." At the time the memoranda of the purchases were indorsed to the plaintiff, it was usual for commission merchants residing and doing business in the city of New York to make advances on western produce, upon the assignment of proper evidences of title thereto. The plaintiff sent Hoyt, his agent, to Fort Wayne, to superintend the shipment of the pork and flour. He arrived at Fort Wayne the 29th of April, but on the 27th of that month a writ of attachment, issued by the Allen circuit court of the state of Indiana, in the name of the bank, against M'Queen & M'Kay was laid upon the pork and flour, and the sheriff retained possession of the property attached, until it was taken out of his possession by the writ of replevin in this case.

The plaintiff made the advancement under a contract that, as commission merchant, he should sell the pork and flour, and, after paying himself for his advances, commissions and expenses, pay over the balance to M'Queen & M'Kay. The attachment and proceedings thereon are admitted to have been regular, and by the statute of Indiana, goods attached may be replevied. It is admitted that in the obtainment of the loan from the bank, M'Queen & M'Kay were guilty of fraud, and that the bank on that ground might have disaffirmed the contract and brought trover for the bank notes, or for the pork and flour which were the proceeds of the notes, before the credit on the loan had expired; but it is insisted that by suing out the attachment the bank affirmed the contract of loan, and consequently the action cannot be sustained before the expiration of the credit. That trover would have been the better form of action for the bank, as regards the pork and flour now in controversy, there can be no doubt. But it is not probable that an action of trover could be sustained for the notes, as proof of their identity would be required. In Ferguson v. Carrington, 9 Barn. & C. 59, it was held, that where goods were purchased fraudulently, an assumpsit for goods sold and delivered, could not be sustained before the time of credit expired, though the vendor might have treated the contract as a nullity, and have brought trover immediately to recover the value of the goods. The same case is reported in 3 Car. & P. 457. In Hanna v. Mills, 21 Wend. 90, Yale v. Coddington, Id. 175, it was decided "that where goods were sold to be paid for by a note or bill payable at a future day, which is not delivered according to the terms of the sale, the vendor may sue immediately for a breach of the special agreement, and recover, as damages, the whole value of the goods, allowing a rebate of interest during the stipulated credit; but that he could not maintain assumpsit on the common counts, until the credit has expired." But in Corlies v. Gardner, 2 Hall, 345,

the court held that an assumpsit for goods sold, could be maintained under circumstances similar to the above; they say "that the sale and delivery of the goods were conditional, and that the plaintiffs might reclaim their goods, or treat the sale as an absolute one without credit." The decision in the case of Dutton v. Solomonson, 3 Bos. & P. 582, is contra. In Campbell v. Sewell, 1 Chit. 609, and 4 Moore, 532, it was held, "that the plaintiff could not declare in indebitatus assumpsit for goods sold, at least before the expiration of the time at which the bills would have become due, but should have declared specially." Where a bill of exchange, given in payment for goods sold was, upon presentment to the drawee, refused acceptance, it was held, that the holder was not bound to present the bill a second time, nor to return it, and that the holders having declared against the drawer on the bill, and joined counts for goods sold, may treat such bill as a nullity, and recover his demand on the latter counts, although the credit on the bill be not expired. Hickling v. Hardey, 1 Moore, 61; 7 Taunt. 312; Smith v. Hodson, 4 Term R. 211; 1 Man. & R. 2.

If a person without authority sell goods belonging to another, and receive a negotiable note in payment, the owner may waive the tort, and maintain an action against him for money had and received, to recover the proceeds of the sale. Whitwell v. Vincent, 4 Pick. 449. An action for goods sold and delivered will lie, although payment was to be made by a note on demand, immediately on a failure to give such note. Loring v. Gurney, 5 Pick. 15. In Manufacturers' & Mechanics' Bank v. Gore, 15 Mass. 75, "the bank finding the security upon which they had agreed to make the loan, had failed by reason of the forgery of the names of the indorsers, and that they had thus been defrauded of a large sum of money, commenced this action, declaring for money had and received, although the term of credit agreed upon for the loan had not expired." "It is a case," the court say, "as respects the plaintiffs, of money obtained from them by misrepresentation and fraud; and we think the only question is, whether upon a loan thus obtained, although upon credit, the bargain may not be disaffirmed by the lender, and an action presently commenced for money so obtained, as had and received, in a legal view, to his use; and upon this we have no doubt." And they observe, "There can be no question of the soundness of the principle, or of its applicability to this action. Here the credit was obtained upon an offer of adequate security. The security was wholly worthless. The consideration for the credit, therefore, failed, and the money thus wrongfully obtained, could not for an instant be conscientiously retained. Ex aequo et bono, then it ought to be returned; and that is the foundation of the action for money had and received."

"Indebitatus assumpsit lies to recover the price and value of goods which the defendant, by fraud, procured the plaintiff to sell to an insolvent, and then got into his own possession; for he could not set up the sale, because his own fraud had procured it; and the mere possession of the plaintiff's goods, unaccounted for, raises an assumpsit to pay." Hill v. Perrott, 3 Taunt. 274; Smedley v. Gooden, 3 Maule & S. 191; Bennet v. Francis, 4 Esp. 28. When a sale is fraudulently procured by the vendee, he may be sued by the vendor for the value of the goods, even before the expiration of the credit agreed to be given. De Symons v. Minchwich, 1 Esp. 430; Arden v. Sharpe, 2 Esp. 523, 524; Seaver v. Dingley, 4 Greenl. 306. In Willison v. Foree, 6 Johns. 110, the plaintiff sold a horse and gig to the defendant for a note on Whaley, which was not due for several months. Whaley was represented by the defendant as good, when he knew him to be insolvent. Plaintiff afterwards offered to return the note and demanded payment, which evidence, under the count for goods sold, the court overruled, and on that ground the supreme court reversed the judgment; and in their opinion said, "If the special contract was void on account of fraud, the plaintiff may disregard it, and bring assumpsit for the goods sold. That the note was no payment." The same doctrine is found in 1 Com. Cont. 38. In Stedman v. Gooch, 1 Esp. 3, Lord Kenyon said, "If in payment of a debt, a bill or note is taken, payable at a future day, the creditor cannot legally commence an action, until such note or bill become payable, or default be made in the payment; but if such bill or note be of no value, as if, for example, drawn on a person who has no effects, and who, therefore, refuses it, the creditor may consider it as waste paper, and resort to his original demand, and sue the debtor upon it." It appears when the goods were purchased in that case, the notes were taken in payment. The same principle is sanctioned in Puckford v. Maxwell, 6 Term R. 52. To this doctrine is opposed the case of Ferguson v. Carrington, above cited, and some other cases. These cases rest upon the simple ground that an action for goods sold and delivered, or money had and received, affirms the contract. Now this assumed ground is unfounded in fact and in law. An action brought before the credit expires, cannot be said to be brought in affirmance of the contract, but in disaffirmance of it. The action is maintainable only upon the ground that the note given in payment being of no value on account of the fraud, may be treated as void, and an action brought immediately for the goods or money obtained through its instrumentality. And in such case, the only defence that could be set up would be the fraud through which the credit was obtained. Is this admissible? Such a position

would be absurd. In this case M'Queen & M'Kay by a gross fraud obtained the money from the bank, the security given to the bank being of no value; and although they have appropriated the money as admitted in this case, yet they contend they are not liable to an action for money had and received, until their credit, fraudulently obtained, shall have expired. Had the bank claimed the pork and flour specifically, by an action of trover or replevin, as the proceeds of the money fraudulently obtained from it by M'Queen & M'Kay, its right to the whole of the property would have been clear, but having issued an attachment, it can claim only as a general creditor, and under the statute other creditors may file their claims. But the only point now under consideration is, has the action been prematurely commenced?

In the case of Cary v. Curtis, 3 How. [44 U. S.] 255, Mr. Justice Story says, "It is an entire mistake of the true meaning of the rule of the common law, that the action of assumpsit for money had and received is founded upon a voluntary express or implied promise of the defendant, or that it requires privity between the parties. ex contractu, to support it. The rule of the common law has a much broader and deeper foundation. Whenever the law pronounces that a party is under a legal liability or duty to pay over money belonging to another, which he has no lawful right to exact or retain from him, there it forces the promise upon him, in invitum, to pay over the money to the party entitled to it. It is a result of the potency of the law, and is in no shape dependent upon the will or consent or voluntary promise of the wrongful possessor." I think the suit may be sustained, there being fraud in the security, though the credit had not expired. An action of trover for the bank notes, without proving the notes, could not be sustained; and this could not be done in one case in a hundred.

It is admitted there was no sale of the property by M'Queen & M'Kay. They indorsed to Gibson, in New York, a commission merchant, the receipted bills of parcels, showing the purchase and payment by them for the pork and flour, and a guarantee that both should pass inspection, &c., and the great question in the case is, whether the advance made by Gibson creates a lien on the pork and flour paramount to the lien of the attachment. There is no evidence that the plaintiff, when he made the advance, had any notice of the fraud of M'Queen & M'Kay. He must then be considered as having acted fairly; and it is admitted that it was usual for commission merchants, in New York, to make advances on Western produce upon the assignment of the proper evidence of title thereto. Whether this "proper evidence of title," consists of such memoranda of purchase as were transferred to the plaintiff in this case, is not stated. From the

letters of M'Queen & M'Kay, to Ludlow & Babcock, commission merchants of Toledo, Ohio, handed to the plaintiff the day he made the advance, and which is made a part of the case, it appears the advance was made on the pork and flour above stated; and nine hundred other barrels of pork "stored at different points on the Wabash Canal." This also appears from a letter written on the same day by the plaintiff, and directed to the same persons, which is also in evidence. It seems, however, to have been the intention of the parties to the agreement, to raise the legal question on the pork and flour attached. No letters were written to Hanna, Hamilton & Co., or D. & J. A. T. Nichols, of whom the pork and flour now in controversy were purchased, informing them of the orders given to the plaintiff; nor had they any knowledge of such orders until after the attachment was laid. The memorandums of purchase with their indorsements have been compared, in their effect, to indorsed bills of lading. A bill of lading possesses many of the qualities of a bill of exchange. In the language of Lord Ellenborough, if a consignee "indorse a bill of lading for a valuable consideration, and without notice by the indorser of a better title, it passes the property." This deprives the owner of the right to stop the goods in transitu. When the indorsement is made in blank, it may be filled up as on a bill of exchange. 6 East, 21, 22; Wright v. Campbell, 4 Burrows, 2046; Tucker v. Humphrey, 4 Bing. 522; Caldwell v. Ball, 1 Term R. 205; Hibbert v. Carter, Id. 745; 3 Kent, Comm. 207.

The memorandums in question are neither in form nor effect, like bills of lading. Have they the character of warehouse receipts? These instruments take their form and effect from usage; consequently, they vary in both these particulars, as usages differ at different places. In Akerman v. Humphery, 1 Car. & P. 54, it was held, that a consignee of goods delivering over to a third person, the shipping note of such goods, and a delivery order on the wharfinger to deliver such goods as soon as they arrive, does not pass the property in them, so as to prevent a stoppage of them in transitu by the consignor. In his opinion in that case, Burrow, Justice, said, "I do not think that the giving the shipping note and delivery order to the plaintiff, made a change of the property." The acceptance of a delivery order by the vendee is not equivalent to an actual acceptance of the goods within the meaning of the statute of frauds. The court say "They" (the warehouse men) "held it originally, as the agent of the vendors; and as long as they continued so to hold it, the property was unchanged." It has been said, "that the London Dock Company were bound by law, when required, to hold the goods on account of the vendee. That may be true, and they might render themselves liable to an action for refusing so to do; but if they did wrongfully refuse to

transfer the goods to the vendee, it is clear that there could not then be any actual acceptance of them by him until he actually took possession of them." After a contract for the sale of goods and a written order on the wharfinger for delivery, communicated to the wharfinger, and assented to by him, though no actual transfer be made on his books, the property passes to the vendee. Assignees of Doorman v. Groning, 7 Taunt. 164. In Hervey v. Liddiard, 1 Starkie, 123, it was held, that where "A, shortly before his bankruptcy, draws a bill, and having procured it to be discounted, gives B, a creditor, an order to receive the amount which he directs C, who discounted the bill, to transmit to B; whilst the money is in the hands of the carrier, A commits an act of bankruptcy, B, who afterwards receives the money, is liable to A's assignees." "An order by A to B, directing the latter to pay over to C, a creditor of A's, the proceeds of a cargo consigned by A to B, creates no lien in favor of C." Assignees of Holland and Humble v. ――――, 1 Starkie, 143. A shipping note and delivery order make no change of property; they do not amount to a bill of lading, which is exactly like a bill of exchange, and the property mentioned in it passes by indorsement. Tucker v. Humphrey, 4 Bing. 516. A merchant in London had been in the habit of selling goods to B, resident in the country, and of delivering them to a wharfinger in London, to be forwarded to B by the first ship. In pursuance of a parol order from B, goods were delivered to, and accepted by, the wharfinger to be forwarded in the usual manner. Held that this not being an acceptance of the buyer, was not sufficient to take the case out of the statute of the 29 Car. II. c. 3. Hanson v. Armitage, 5 Barn. & Ald. 557. In Barrett v. Goddard [Case No. 1,046], it was held that where goods were sold, lying in the vendor's warehouse, on credit, and they are sold by marks and numbers, so that no further designation is necessary, and it is a part consideration of the bargain that they may remain there rent free, at the option of the vendee, and for his benefit, until the vendor shall want the room; there is in point of law a complete delivery of the goods.

To constitute a lien there must be an actual or constructive possession of the thing, by the party asserting it; for a lien is a right to retain a thing, which presupposes a lawful possession, which can arise only from a just possession under the owner or other party against whom the claim exists. If the thing has not yet arrived at the possession of the party, but is still in transitu, or if he has only a right of possession, the lien does not attach thereon. Story, Ag. § 361. Chancellor Kent, in the second volume of his Commentaries (page 638), says, possession of the goods is necessary to create the lien; and the right does not extend to debts which accrued before the character of factor commenced; nor when the goods of the principal do not, in fact, come to the factor's hands even though he may have accepted bills upon the faith of the consignment, and paid part of the freight. Kinloch v. Craig, 5 Term R. 119, 783. A sale of goods without delivery of possession is invalid as against an attaching creditor of the vendor. Lanfear v. Sumner, 17 Mass. 110; Shumway v. Rutter, 7 Pick. 56; Parsons v. Dickinson, 11 Pick. 352. On their face the bills of parcels do not show and do not purport an actual delivery of the flour and pork, and there was in fact no formal delivery of either. The papers show an obligation by the warehouse keepers to deliver the pork and flour soon after the canal shall open, and that they shall both pass inspection. But in regard to the pork, the agreed case admits that the barrels of pork were in the warehouse. A formal delivery of personal property is not necessary to change the title. A part, in the name of the whole, may be delivered; and frequently the delivery of the evidence of the transfer is considered a symbolical delivery of the thing sold. This question is controlled by commercial usages in reference to the nature and condition of the property. 1 East, 194; Atkinson v. Maling, 2 Term R. 462.

The receipted bills of parcels and guarantees were not assignable as bills of lading. They contained evidence of the articles purchased, of payment and the guarantees, and as such were important to the purchasers; but whether the evidence of the articles purchased, the payment and guarantees, were contained on one or several papers, was immaterial. No usage is known or proved in Indiana or New York, which gives to these papers' any other effect than as evidence of the above facts. There was no condition expressed or understood that the pork and flour were to be delivered to the holder of the papers, or that their production was necessary to obtain the property. A simple order for the pork and flour of Gibson, would have had the same effect, as the indorsement of the above papers. If M'Queen & M'Kay had given an order to the warehouse men to deliver the property to any one, they would have delivered it, without incurring any liability to Gibson, they having no knowledge of his claim. Had M'Queen & M'Kay taken the property into their own possession, they would not have been responsible to Gibson for the value of the property, but only for the advance, including interest and damages for a violation of the contract. There having been no sale, and the property not having passed into the actual possession of Gibson, he could not have recovered the property by any legal process, even from the possession of M'Queen & M'Kay. Had the property passed into the possession of Gibson after notice, he could not, as the factor of M'Queen & M'Kay, have sold more of it than would refund his advance, interest and charges. But not having possession of the property, he could not, in equity, enforce

against it his claim to any thing beyond an indemnity.

But the case does not turn upon this principle. Before any notice was given, the bank laid an attachment on the property. Neither the warehouse men or the bank knew any thing of the advance of Gibson, or of the order, until after the attachment. But suppose there had been notice, M'Queen & M'Kay had an attachable interest in the property. The first cost of the pork and flour exceeded the advance about a thousand dollars. M'Queen & M'Kay, then, to this extent, at least, were interested in the property, and that interest was attachable. By the 383d section of the execution laws (Rev. Code 1843), all the interest of a mortgagee, pledgee, or assignee of personal property is liable to be levied on and sold by execution. And in the case of Evans v. Darlington, 5 Blackf. 320, the court held there, the same interest may be reached by an attachment. If the lien asserted by Gibson be good to the extent as contended, it withdraws the property from the state of Indiana, and compels the creditors of M'Queen & M'Kay who reside in the state, to follow it to the state of New York. And the principle would be the same, had an advance of one thousand dollars been made on ten thousand dollars worth of property. So careful is the law of the rights of creditors, that an executor under a foreign jurisdiction cannot withdraw the property of the deceased from the local jurisdiction, to that of the domicil of the deceased, to the prejudice of creditors. Much more, it would seem, cannot this be done in the case under consideration; a case where in fact there has been no sale; and where, if the lien of the commission merchant attached, it could only extend to the advance made.

In Black v. Zachara, 3 How. [44 U. S.] 511, the supreme court held, that an attachment of bank stock in Louisiana, which had previously been assigned by the owner in South Carolina, of which the plaintiff in the attachment had notice, before the writ was issued, could not be sustained. The court say, "Now in the case before us, there is plenary evidence that the assignment was valid and effectual by the laws of South Carolina, when and where it was made, to pass the right to the property in controversy; and that the attaching creditors had notice thereof before their attachment was made." And so in a late case in the supreme court of Louisiana, where the effects of the United States Bank were attached in that state, after a due assignment of them had been made in the state of Pennsylvania, of which the attaching creditors had notice, it was held the attachment could not be sustained. This case, and the one above cited, are made to turn on the fact of notice. And if in the case under consideration, before the attachment was laid upon the property, the plaintiff had had notice of the order, the lien of Gib-

son to the extent of his advances would have been protected. In Babcock v. Maltbie, 7 Mart. (N. S.) 137, the court say, the true test in cases of assignment is, "that where the owner of the property has lost all power over it and cannot change its destination, the creditors cannot attach." This rule is apparently sanctioned by the supreme court of the United States in the case above cited; but it is not true, except upon the supposition that the whole transaction was bona fide. For if a man fraudulently transfer his goods, he has lost all power over them, but his creditors may attach them. In the case of Gibson, M'Queen and M'Kay, before the notice, had power to sell the property and transfer a good title.

In Story, Confl. Laws, § 416, it is said, "Neither is it true, that even the voluntary conveyances of parties in all cases are to be held valid, where they are prejudicial to the rights and remedies of our own citizens. In Massachusetts, for instance, it has been held, that a voluntary assignment by a debtor of all his property, made in Pennsylvania, for the benefit of creditors generally, shall not prevail over a subsequent attachment of the funds of the debtor, made after the assignment, because such an assignment would be void by the laws of Massachusetts, if made in that state, as being in fraud of creditors; and it is unjust and unequal in its effects, and prejudicial to the citizens of the state." "In such a case, therefore, the party who shall by process first attach the debt or seize the property, ought to prevail, whether creditor or assignee." Ingraham v. Geyer, 13 Mass. 146; Olivier v. Townes [2 Mart. (N. S.) 97]; 6 Pick. 286, 307. And Chancellor Kent (2 Comm. 406) says, "It may be considered as part of the settled jurisprudence of this country, that personal property, as against creditors, has locality, and the lex loci rei sitae prevails over the law of the domicil with regard to the rule of preference in the case of insolvent estates." In Lanfear v. Sumner, 17 Mass. 110, the court held, "A conveyance made in Philadelphia to plaintiff of a quantity of tea on board a ship bound to Boston, which was afterwards attached by a creditor in Boston, that the defendant must prevail, as there was no legal delivery before the attachment. That it was a case of two creditors, each endeavoring to secure his debt out of the same fund; he who first acquires possession will hold the goods."

In the case of Hoffman v. Noble, 6 Metc. (Mass.) 68, the court very properly held, that where a consignee had made an advance to the full value of the goods, in good faith, and they having come into his possession, he stood in the light of a purchaser. It is supposed that a decision against the paramount lien of the plaintiff, as here asserted, may tend to prevent the customary advances on the shipment of produce. Factors or commission merchants must be cautious to whom they make advances. The legal right of the bank grow-

ing out of the fraud, to the pork and flour, if asserted by an action of trover, is not disputed. And this shows that the case turns mainly upon a mere technicality. But on the other side, the rights of creditors are involved, and the assertion of those rights under the jurisdiction where the property is found. If by a small advance on a large amount of property, by a factor, a fraudulent purchaser may remove the property to a foreign jurisdiction, beyond the reach of his local creditors, frauds of the greatest magnitude may be practised. The facts of the present case strongly illustrate this, and show under such a rule with what facility and impunity such frauds may be committed.

This is probably the first case involving some of the precise questions, above considered. I have felt an uncommon solicitude on the subject, and took occasion, at the last term of the supreme court attended by my lamented Brother Story, to consult him on the points ruled, and I was gratified to find that he coincided with the opinion as now expressed. Upon the whole, we direct a judgment of de retorno habendo.

[NOTE. This judgment was reversed by the supreme court—§ How. (49 U. S.) 384—in an opinion by Chief Justice Taney, who held there was but a single question involved in it, viz. whether the property in dispute was transferred to the plaintiff and vested in him by the indorsement and delivery of the warehouse documents in the manner stated in the case. "This mode of transfer and delivery has been sanctioned in analogous cases by the courts of justice in England and this country, and is absolutely necessary for the purposes of commerce." This symbolical delivery was fully sustained in Conard v. Atlantic Ins. Co., 1 Pet. (26 U. S.) 445. No formal assignment in such transactions is necessary, as the technical rules of common-law conveyances and transfers of property have never been applied to mercantile contracts made in the usual course of business.]