NATIONAL BANK OF COMMERCE IN ST. LOUIS v. EQUITABLE TRUST
CO. OF NEW YORK.

(Circuit Court of Appeals, Eighth Circuit.   September 29, 1915.   On Petition
for Rehearing, November 1, 1915.)

No. 4213.

1. CORPORATIONS ⬤⟺123—PLEDGE OF STOCK—RIGHT TO DIVIDENDS.
    A pledgee of corporate shares may recover from the corporation a
    dividend declared thereon to the extent of his interest, and if the pledgor
    collects the dividend he holds it as trustee for the pledgee; if collected
    by a third person having knowledge of the rights of the pledgee, the
    latter may recover it on the common count for money had and received.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491,
    507–512, 537, 539–546, 569, 618; Dec. Dig. ⬤⟺123; Pledges, Cent. Dig. §§
    1–194.
    Rights and liabilities of pledgee of corporate stock, see note to Frater
    v. Old Nat. Bank, 42 C. C. A. 135.]

2. MONEY RECEIVED ⬤⟺1—NATURE OF REMEDY—EQUITABLE RIGHT—IMPLIED
    PROMISE.
    A contractual relation between the parties is not necessary to support
    an action of assumpsit for money had and received, which is based upon
    an equitable right from which a promise is implied.
    [Ed. Note.—For other cases, see Money Received, Cent. Dig. § 1; Dec.
    Dig. ⬤⟺1.]

3. EQUITY ⬤⟺39—WAIVER OF OBJECTIONS TO JURISDICTION—RETENTION OF
    JURISDICTION ACQUIRED.
    If the jurisdiction of a court of equity is not challenged, and it is
    rightfully in possession of a cause as it is made by the bill, it will pro-
    ceed to determine the whole matter in controversy and grant full and
    complete relief, although the relief granted may be such as is usually
    had in an action at law.
    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 104–114; Dec.
    Dig. ⬤⟺39.]

4. EQUITY ⬤⟺42—JURISDICTION—WAIVER OF OBJECTION.
    One who consents to the hearing and submission in equity of a legal
    cause of action is estopped to thereafter object to the mode of trial.
    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 119, 120; Dec.
    Dig. ⬤⟺42.]

5. BANKS AND BANKING ⬤⟺261—NATIONAL BANKS—LIABILITY FOR MONEY RE-
    CEIVED UNDER CONTRACT ULTRA VIRES.
    A national bank which has received money equitably belonging to
    another cannot defend against a suit for its recovery on the ground that
    it was received as an incident of a contract made by the bank which was
    ultra vires and not enforceable.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§
    991–1000; Dec. Dig. ⬤⟺261.]

6. CORPORATIONS ⬤⟺123—PLEDGE—SUIT BY PLEDGEE TO RECOVER DIVIDENDS.
    In a suit to recover dividends declared and paid on corporate stock
    while it was held by complainant as collateral security for a debt of a third
    person, and received and retained by defendant bank, defendant *held* en-

⬤⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

titled to credit for the amount of interest and partial payments thereafter paid by it on the debt secured.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. ⬤⇒123; Pledges, Cent. Dig. §§ 1–194.]

7. ELECTION OF REMEDIES ⬤⇒14—ACTS CONSTITUTING ELECTION—WAIVER OF TORT.

An action cannot be ex contractu for one purpose and ex delicto for another, and where it is based on the waiver of a tort and an affirmance of a transaction, the waiver is for all purposes of the case.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 16; Dec. Dig. ⬤⇒14.]

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit in equity by the Equitable Trust Company of New York against the National Bank of Commerce in St. Louis. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 211 Fed. 688.

In the fall of 1906 and for sometime theretofore George E. Nicholson was and had been engaged in the manufacture of cement at Iola, Kansas. He was a man of large affairs and had property then worth about one million dollars. One of his competitors was a New Jersey corporation which owned and operated a plant there, all of its stock being at that time owned by the Iola Portland Cement Company, a corporation of West Virginia. The latter company also owned all of the stock of a Texas corporation, organized for a like purpose, and its plant was then under construction in the latter state. Nicholson feared that the competition and rivalry between the plant in which he was interested and that controlled by the West Virginia company might become disastrous to his interests, and on that account he conceived a plan to acquire a control of the common stock in the West Virginia company, which amounted to 120,000 shares of the par value of $25.00 each; that company had preferred shares outstanding also but holders of those shares did not participate in the management, and profits on them were restricted.

Nicholson ascertained that he could buy 110,330 shares of the common stock at par, that is, for $2,758,250. He could not, by his own efforts, obtain so large a sum, so in the latter part of 1906 he approached Mr. Van Blarcom, president of appellant bank, for the purpose of obtaining the assistance of Van Blarcom and his bank in raising the funds. As the negotiations between Nicholson and Van Blarcom progressed J. W. Perry, then an employé and later an officer of the bank, was brought into the matter for the purpose of having him take both formal and active participation in behalf of the bank. The result of the negotiations is shown by a written contract between Nicholson and Perry of date January 17, 1907, from which it appears (a) that Perry was to purchase the common stock of the West Virginia company, (b) that Nicholson was to pay Perry, upon demand, all sums expended in the purchase and expenses, (c) Perry was to use his best efforts to negotiate for and procure for Nicholson the loan of such money as was necessary to make the purchase, (d) for that purpose Nicholson was to execute in blank "notes and contracts of pledge in such manner and form and conditioned and provisioned as said J. W. Perry, or B. F. Edwards, or the president or cashier of the National Bank of Commerce in St. Louis (all of which said parties are hereinafter referred to as 'said parties or either of them') may require, and to deliver the same to the National Bank of Commerce in St. Louis; and hereby authorizes said parties or either of them to fill up said notes and contracts of pledge in such way, and in such amount, payable at such time and to such

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

parties, and bearing such rate of interest as said parties or either of them
may elect, and does hereby authorize said parties or either of them upon filling
up said notes and contracts of pledge, to deliver the same to such party or
parties as said parties or either of them may elect, for the purpose of obtain-
ing said loan or loans of money. Said parties or either of them shall have the
power, upon maturity of any of such notes to fill up and deliver said renewal
notes and contracts of pledge therefor, if they so elect, and for that purpose
said George E. Nicholson shall execute or have others execute for him, and
deliver to said bank, in like manner as above provided, his collateral notes,
and contracts of 'pledge;" Nicholson further "agrees to deliver to the Na-
tional Bank of Commerce in St. Louis, at least the sum of Two Million Dollars
par value of collateral, and maintain in value the same from time to time, to
be satisfactory to said parties or either of them," and "said parties or either
of them shall have the power to pledge said collateral or such part thereof for
the payment of all or any of said notes, in such part and amount, as in the
judgment of said parties or either of them, they may deem best;" (e) all
of the common stock so purchased by Perry was to be, and was in fact, trans-
ferred to his name, and he was to hold the same in trust until the full amount
of all the notes of Nicholson were fully paid; Perry had the power to vote
the stock, to pledge or hypothecate it for the purpose of securing the payment
of any or all of Nicholson's notes, and to pledge it or hypothecate it to secure
any renewal of said note or notes; provided, upon the full payment by either
Perry or H. G. Hamilton, of Youngstown, Ohio, or Nicholson, of one-third of
the purchase price of said stock, together with such interest thereon as
Nicholson may have paid or become liable to pay, less dividends on said stock
in the meantime, then said third of the stock so purchased was to be de-
livered to the party making such payment and transferred on the books, pro-
vided said stock had not been sold or disposed of under contract or contract
of pledge by the contract authorized, and provided further that any part of
said one-third may be withdrawn on the same conditions pro rata.

The contract also gave Perry the power and duty "To collect and receive
during said period of time all dividends that may be declared and paid on
said stock not disposed of under contract or contracts of pledge, as herein-
above authorized and apply the same to the payment of the principal and
interest on said notes, provided to be executed by George E. Nicholson or
others for him, and filled up and delivered by said parties or either of them
as hereinabove provided, as in the judgment of said parties or either of them
may be deemed best." (f) It was further provided that on the payment of
all the notes executed by Nicholson, Perry would cause the National Bank of
Commerce in St. Louis to deliver to Nicholson all the collateral he had de-
posited with it for the purpose of securing the payment of the notes; and (g)
"The National Bank of Commerce in St. Louis shall have the power at any
time to remove as a party hereto and trustee herein, J. W. Perry, and sub-
stitute any other party in his stead, upon notice to that effect, in writing, de-
livered to Mr. George E. Nicholson; and in the event of the death of said
J. W. Perry, to appoint a party to succeed him as a party hereto and as
trustee herein. In either of said events, said party so appointed by the Na-
tional Bank of Commerce in lieu of said J. W. Perry, shall succeed to all his
rights and duties herein as a party to this agreement and as trustee herein.
This provision shall not be construed to make the National Bank of Com-
merce in St. Louis liable in any respect whatever on account of any obligation
or duty assumed by J. W. Perry, either as party or trustee under this con-
tract."

Some two years later the bank under authority given in the contract sub-
stituted Tom Randolph, one of its officers, as trustee instead of Perry.

It will be observed that H. G. Hamilton, of Youngstown, Ohio was inter-
ested in the contract; but it appears from the proof that he and those asso-
ciated with him withdrew, the appellant furnishing the money to buy them
out, formally taking Nicholson's notes to itself in the manner laid out in
the original contract.

The 110,330 shares of common stock were purchased by Perry, Nicholson co-operating with him, in January, 1907, and the $2,758,250 required to pay for the same was obtained from the following:

| | |
|---|---:|
| Bowling Green Trust Company of New York | $ 250,000 |
| National Park Bank, New York | 100,000 |
| First National Bank, Kansas City | 50,000 |
| Pioneer Trust Company, Kansas City | 50,000 |
| National Bank of Commerce, Kansas City | 100,000 |
| Commerce Trust Company, Kansas City | 100,000 |
| Commonwealth Trust Co., St. Louis | 300,000 |
| William Lanyon | 500,000 |
| National Bank of Commerce, St. Louis, Appellant | 1,308,250 |

And for the respective sums the notes of Nicholson were given, and as collateral security there went with each note common shares so purchased in the West Virginia company equal in par value to the amount named in the note. As additional collateral other stocks belonging to Nicholson and placed with the Bank of Commerce under the requirements of the contract were distributed among the lenders.

Nicholson's note given to the Bowling Green Trust Company for $250,000 was of date January 22, 1907, payable in six months, and the rights of the Bowling Green Trust Company (and appellee with which it was later merged) as pledgee of the 10,000 shares of common stock in the Iola Portland Cement Company of West Virginia, which it took as collateral security on its note, are the subjects of this litigation. The note was also signed by one Cockerill, who was at the time good for that amount, but he later became insolvent.

Perry induced the Bowling Green Trust Company to make the loan; he went to New York for that purpose as a representative of appellant, with a letter of introduction from Van Blarcom; and when the loan was promised Nicholson's note and the collateral were forwarded by the appellant. Certificates for the shares put up with it stood in the name of Perry, as trustee.

Renewals of the loan were made every six months through the request of appellant and without the personal participation of Nicholson, except, perhaps, the last one or two renewals in which he personally participated. Two payments of $50,000 each were made on the loan by the appellant, one in July, 1909, and one in July, 1910. The last renewal was of date July 25, 1910, for $150,000, and interest on that note has been paid up to July 1, 1911.

The Bowling Green Trust Company was merged with the Equitable Trust Company, appellee, under New York statute in April, 1909, and the last three renewals were payable to the latter company.

On February 6, 1908, a dividend of $6.25 per share was declared on the common stock of the West Virginia company, payable March 10, 1908, and on December 23, 1908, a further dividend on that stock of $12.50 a share was declared payable January 1, 1909. Eleven days prior to the declaration of the last dividend Perry appeared at the office of the Bowling Green Trust Company in New York and requested an exchange of collateral on the indebtedness of Nicholson to that company, and succeeded on that day in obtaining the consent of the trust company to surrender the 10,000 shares of common stock in the West Virginia company and to take in lieu thereof as collateral for that debt 14,000 shares ($25.00 each) of preferred stock in that company then held by appellant, which it had obtained in carrying out the deal under the contract of January 17, 1907, for the benefit of the parties thereto.

Perry returned to St. Louis and on December 23rd, the day the dividend was declared, he transmitted in a letter, which he signed as vice president of appellant, the preferred shares to the Bowling Green Trust Company to be substituted for the 10,000 common shares which it held, and thereafter on December 26th, the trust company surrendered the common shares and sent them to Perry, he acknowledging receipt thereof in a letter of date December 28th, as vice president of appellant.

Van Blarcom's letter of introduction which Perry carried with him to the Bowling Green Trust Company in January, 1907, on his first visit there for the purpose of securing the loan to Nicholson, in referring to Perry's mission,

recited: "We intend to take a large interest in the transaction ourselves and will advance the money on the same securities which he (Perry) will offer to you. Further details will be explained by Mr. Perry."

During Perry's negotiations with the trust company at that time he was asked by the representative of the trust company if the National Bank of Commerce, or some of its officers, would guarantee or endorse the Nicholson note, and he answered that they would not.

The learned District Judge who heard the case below found as a fact that the trust company at the time it surrendered the 10,000 common shares had no knowledge or information that the dividends had been declared; and as there is testimony to support this finding we so accept it. The trust company did not ascertain that fact until long thereafter.

In January, 1907, officers, directors and employés of the bank were made directors of the cement company, and thereafter they constituted a majority of the board, and controlled and directed its affairs, and were members of said board when the dividends were declared. The dividends as declared went into the appellant bank in an account entitled "George E. Nicholson Trustee account," and were checked out and used to apply on various indebtedness incurred in the deal, most all of which was gradually taken over by the bank, including its own original loan, as pressing circumstances in the judgment of the bank from time to time required.

Sometime after appellant obtained the 10,000 shares of common stock from the trust company in exchange as above noted and had gotten all of the other 110,330 shares of common stock into its possession, it realized that it must be rid of them. This was doubtless due to requirements under the National Banking Act, and apparent approaching failure of the entire venture. It still held them as collateral on Nicholson's large indebtedness, and probably also on the indebtedness of the cement company and its subsidiaries. It was able in December, 1909, to make contracts of sale, largely to those interested in the bank, of 73,552 shares at $8.15 per share; but by stipulation it was agreed that only $487,763.71 was realized thereon. The other shares, 36,778, it took over itself at that agreed price; but it was further stipulated that all of these shares so taken by it were later charged off as utterly worthless. The National Bank of Commerce had greatly extended its credit to Nicholson in addition to the original transaction in the purchase of the common stock, in taking up his indebtedness to Hamilton and associates of Youngstown, Ohio, and other claims against him; and had also extended large credits to the cement company and its two subsidiary companies, and later suffered very great losses in all of these transactions. Both Nicholson and the cement companies became wholly insolvent.

The last renewal note given to appellee for $150,000 and interest thereon after July 1, 1911, has not been paid, and the appellee sought in this suit to recover from appellant the amounts of the two extra dividends of twenty-five per cent. and fifty per cent., also four semi-annual dividends of two per cent declared in 1907 and 1908 while the Bowling Green Trust Company held the 10,000 shares, and also the amount realized on those shares on sale of same by appellant, to the extent of its unpaid note and interest thereon. And in January, 1914, decree was entered below in favor of appellee for recovery of $172,800 and execution awarded.

George L. Edwards and Edward D'Arcy, both of St. Louis, Mo. (H. S. Priest, of St. Louis, Mo., on the brief), for appellant.

Charles P. Howland, of New York City, and Frederick N. Judson, of St. Louis, Mo. (John F. Green, of St. Louis, Mo., and George A. Gordon, of New York City, on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and LEWIS, District Judge.

LEWIS, District Judge (after stating the facts as above). [1] 1. The law which determines the rights of the parties as to the dividends

may be briefly stated: (a) A pledgee of corporate shares may recover from the corporation declaring a dividend thereon such dividend to the extent of the interest of the pledgee under the pledge, Thompson on Corporations, § 2181; Cook on Corporations (4th Ed.) § 468; Gemmell v. Davis, 75 Md. 546, 23 Atl. 1032, 32 Am. St. Rep. 412; Guarantee Co. v. Town Co., 96 Ga. 511, 23 S. E. 503, 51 Am. St. Rep. 150; Bank v. Wilder, 32 Neb. 454, 49 N. W. 369; Bank v. Mosher, 63 Neb. 130, 88 N. W. 552; George, etc., Co. v. Range, etc., Co., 16 Utah, 59, 50 Pac. 630; Gaty v. Holliday, 8 Mo. App. 118, and if the pledgor collects the dividend he holds it as trustee for the pledgee, Jones on Collateral Securities & Pledges (3d Ed.) § 398; (b) and as against a third party receiving the dividend with knowledge, of the rights of, the pledgee, the latter may recover on the common count for money had and received.

The first proposition is not seriously doubted, but the second is earnestly denied. We think they are equally sound. The argument on the point is, that assumpsit is not maintainable unless there be, in fact, privity of contract between the parties; and it is said that that relation did not exist between the St. Louis bank and the Bowling Green Trust Company.

[2] We note the general character of the action. In Cary v. Curtis, 3 How. 236, 246 (11 L. Ed. 576) it is said:

"The action of assumpsit for money had and received, it is said by Lord Mansfield, Burr. 1012, Moses v. Macfarlen, will lie in general whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by the ties of natural justice and equity to refund. And by Buller, Justice, in Stratton v. Rastall, 2 T. R. 370, 'that this action has been of late years extended on the principle of its being considered like a bill in equity. And, therefore, in order to recover money in this form of action the party must show that he has equity and conscience on his side, and could recover in a court of equity.' These are the general grounds of the action as given from high authority."

In Gaines v. Miller, 111 U. S. 395, 397, 4 Sup. Ct. 426, 427 (28 L. Ed. 466):

"Whenever one person has in his hands money equitably belonging to another, that other person may recover it by assumpsit for money had and received."

The contention is old and was early repudiated as demonstrated by the note to Mandeville v. Riddle, in Appendix to 1 Cranch, 367, under subd. 4, page 438. For collation of additional authorities see 1 Chitty on Pleadings (16th Am. Ed.) star pages 112, 362 and 363, notes. In Cary v. Curtis, supra, 3 How. 254, 11 L. Ed. 576:

"It is an entire mistake of the true meaning of the rule of the common law, which is sometimes suggested in argument, that the action of assumpsit for money had and received is founded upon a voluntary, express, or implied promise, of the defendant, or that it requires privity between the parties ex contractu to support it."

The rule is aptly stated by Bigelow, Judge, in Brewer v. Dyer, 7 Cush. (Mass.) 337, 340:

"The law, operating on the act of the parties, creates the duty, establishes the privity, and implies the promise and obligation, on which the action is

founded." Leete v. Pacific M. & M. Co. (C. C.) 88 Fed. 957; Bank v. Bank (C. C.) 19 Fed. 301.

The action lies for money which "ex æquo et bono, the defendant ought to refund." Stockett v. Watkins, 2 Gill & J. (Md.) 326, 20 Am. Dec. 438; Norden v. Jones, 33 Wis. 600, 14 Am. Rep. 782; Stimpson v. Insurance Co., 47 Me. 385; Horne v. Mandelbaum, 13 Ill. App. 607.

[3] 2. When it came to the decree it went only for the recovery of a sum certain; and it is assigned as error that plaintiff below went into the wrong forum, that it had a plain, adequate and complete remedy at law, and that consequently there was no jurisdiction in equity over the controversy. As already indicated, the proceeding has been treated here, in brief and argument, as in assumpsit. Of course, if the bill had disclosed that as the true character of the action and there was nothing else in the bill on which equitable relief was appropriately invoked, the trial court would have undoubtedly dismissed the bill had it been challenged on that ground. Gaines v. Miller, 111 U. S. 398, 4 Sup. Ct. 426, 28 L. Ed. 466; and without challenge it should in that event have been dismissed. Oelrichs v. Spain, 15 Wall. 211, 227, 21 L. Ed. 43; Amis v. Myers, 16 How. 492, 14 L. Ed. 1029; Sullivan v. R. R. Co., 94 U. S. 806, 811, 24 L. Ed. 324. But if a court of equity is rightfully in possession of the cause as it is made by the bill, it will proceed to determine the whole matter in controversy and grant full and complete relief, although the relief granted may be such as is usually had in a proceeding at law. Cathcart v. Robinson, 5 Pet. 264, 278, 8 L. Ed. 120.

The bill had a wide scope. True, its ultimate purpose was to have the appellant declared a trustee for the benefit of the complainant of the moneys which it sought to recover. But in many and lengthy paragraphs it sets forth the transactions in which appellant was involved and which it sought to carry out under the contract between Nicholson and Perry of date January 17, 1907; the relations of appellant thenceforth to the cement company and its control of the board of directors of that company and its subsidiary companies which owned the plants in Kansas and Texas, its extensions of credits to the cement company, and its direction of the affairs and business, in general, of that company; fraudulent conduct, as appellee alleges on information and belief, on the part of appellant in relation to, and in conducting the business of, the cement company and its subsidiaries, as well as toward the Bowling Green Trust Company in connection with taking down the 10,000 shares collateral and substituting others, and the fiduciary relations theretofore existing between appellant and the trust company, and attaches interrogatories for the purpose of requiring a disclosure and accounting in relation to the charges made. "Thus (on the face of the bill) there were in the case, as ingredients to support the jurisdiction of equity discovery, account, fraud, misrepresentation and concealment" (Tyler v. Savage, 143 U. S. 79, 95, 12 Sup. Ct. 340, 36 L. Ed. 82), and the fiduciary and trust relations. A court of equity takes cognizance of controversies involving a trust relation, whether it be a resulting one growing out of the relations of the parties and their acts toward each other, or a

constructive one raised and interposed by a court of equity to prevent accomplishment of fraudulent purposes. Hopkins ' v. Grimshaw, 165 U. S. 342, 358, 17 Sup. Ct. 401, 41 L. Ed. 739; Clews v. Jamieson, 182 U. S. 461, 479, 21 Sup. Ct. 845, 45 L. Ed. 1183.

[4] Moreover, the objection was not made until after answer, trial and submission of the cause to the court, and this court has given a short and direct answer to the contention. "One who consents to the hearing in equity of a legal cause of action, or to the trial of an equitable cause of action at law, is thereby estopped from successfully objecting for the first time in an appellate court to the method of trial which he adopted." Highland Boy G. M. Co. v. Strickley, 116 Fed. 852, 854, 54 C. C. A. 186, 188 and cases there cited. Southern Pacific R. R. Co. v. United States, 200 U. S. 341, 26 Sup. Ct. 296, 50 L. Ed. 507, s. c. 133 Fed. 651, 66 C. C. A. 581; Tyler 'v. Savage, 143 U. S. 79, 97, 12 Sup. Ct. 340, 36 L. Ed. 82.

[5] 3. One of the defenses set up in the answer was that the contract between Nicholson and Perry, as representing the bank, was an agreement and transaction into which the bank could not enter, that it was ultra vires the bank, and that the bank is not liable for any of its acts under that contract; and this is now relied upon. That this position cannot be maintained, where the proceeding is to recover moneys which have gotten into the hands of the bank but belong to the plaintiff, we need only to call attention to what is said in Louisiana v. Wood, 102 U. S. 294, 299, 26 L. Ed. 153, and Citizens' National Bank v. Appleton, 216 U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. 443. ·

[6] 4. The appellant was liable for the dividends on the 10,000 shares declared and paid by the cement company and coming into appellant's hands with knowledge of the facts while the shares were held as collateral on the indebtedness to the trust company. Those dividends were as follows: One of twenty-five per cent. declared February 6, 1908, $62,500; one of fifty per cent. declared December 23, 1908, $125,000, and two semi-annual dividends declared in 1907 and two in 1908, each two per cent., $20,000—total, $207,500. Thereafter in July, 1909, the bank remitted the trust company $50,000 as a partial payment on Nicholson's renewed note, and in July, 1910, a like amount, thus reducing the principal to $150,000; and it also paid the interest on the loan up to July 1, 1911. The total interest payments thus made amounted to $57,875, figured at the rate of six per cent, which appears to be the average rate charged. The bill alleges that these partial payments and interest up to July 1, 1911, were made by appellant. The partial payments were made long after all of the dividends on the common stock were declared and received into the bank, and the far greater part of the interest was also paid after those dividends had been declared and received. We see no reason why these payments amounting to $157,875 should not be charged against and taken out of the dividends theretofore turned over to the bank, thus leaving $49,625 of those dividends unaccounted for; and we believe this ought to be done, on which amount appellee was entitled to interest at six per cent. per annum from

January 1, 1909, the day the fifty per cent. dividend was made payable. Even the common count for their recovery is said to be equitable in character. · A defendant in such ' an action is required to account only for what he has actually received of the moneys belonging to the complainant. We are not unmindful of the fact that notwithstanding the allegations of the bill that the payments were made by the appellant, the answer alleges and the proof discloses that before the partial payments were made the appellant went through the form of taking Nicholson's note in each instance for the amount of the payment and then remitted; but looking at substance and not form, it is evident that the moneys so used were put up by the bank, and the same is true of the interest payments.

After the exchange of collateral, the trust company taking 14,000 preferred shares in lieu of the 10,000 common, five semi-annual dividends of three and a half per cent. each were declared and paid on the preferred stock. The first three of these dividends were declared while the trust company held the 14,000 shares in pledge, but when the last two were declared the trust company held only 11,000 of said shares, it having surrendered to the St. Louis bank 3,000 of said shares on July 25, 1910, at the request of the bank. None of these dividends, as such, were paid over by the bank to the trust company. They were as follows: three and a half per cent. on 14,000 (face value $350,000), payable July 2, 1909, $12,250, three and a half per cent, payable January 1, 1910, $12,250, and three and a half per cent, payable July 1, 1910, $12,250, three and half per cent. on the 11,000 (face value $275,000), payable January 1, 1911, $9,625, and three and a half per cent, payable July 1, 1911, $9,625— a total in dividends on the preferred while held by the trust company of $56,000. It is fairly inferable from the proof that all of these dividends were paid into and taken over by the bank and applied by it in the same manner that it used the dividends on the common stock; and while the bill does not make specific claim to them, its general prayer is sufficient for that purpose. The appellee was therefore entitled to recover the dividends declared on the preferred stock while it held it in pledge as collateral security, with six per cent. added thereto from the dates on which they were severally payable.

[7] 5. There is no basis in this action on which recovery of the proceeds on sale of the common stock by appellant can be rested. Neither the appellee nor its predecessor in interest could be said to be the owner of those proceeds when they were taken over by appellant. The sale from which the proceeds arose was made in December, 1909, which was one year after the common stock had been surrendered and delivered back to the pledgor. It is familiar law that the validity of a pledge depends upon its delivery to and continued possession by the pledgee. Jones on Collateral Securities & Pledges (3d Ed.) §§ 23 and 40. In Casey v. Cavaroc, 96 U. S. 467, at page 477 (24 L. Ed. 779), it is said:

"The difference ordinarily recognized between a mortgage and a pledge is, that title is transferred by the former, and possession by the latter. Indeed, possession may be considered as of the very essence of a pledge (* * *); and

if possession be once given up, the pledge, as such, is extinguished."  Bidstrup v. Thompson (C. C.) 45 Fed. 452, 454; Thurber v. Oliver (C. C.) 26 Fed. 224; Insurance Co. v. Iron Co. (C. C.) 81 Fed. 439, 445; Pauly v. Loan & Trust Co., 58 Fed. 666, 7 C. C. A. 422; Phelps v. Church, etc., 115 Fed. 882, 53 C. C. A. 407, s. c. 99 Fed. 683, 40 C. C. A. 72.

The trust company was not the owner of the 10,000 common shares and had no interest or special property right in them as pledgee after it delivered them back to the pledgor, and appellee cannot therefore successfully claim that at the time the bank sold the shares and received the proceeds it was disposing of property which belonged to the former.  Indeed, we do not understand that any such claim is asserted, but the contention in that respect is that recovery may be had because the shares were obtained from the pledgee through deception and fraud practiced by the pledgor and the bank.  That is to say, the tort is not waived but expressly relied upon.  An action cannot be ex contractu for one purpose and ex delicto for another.  The tort must not only be waived in order to maintain assumpsit, but when waived it is no longer an element in the case, not even in defense, for the defendant could not set it up.  Gibson v. Stevens, 3 McLean, 551, Fed. Cas. No. 5401, and citations to the point.  And when waived plaintiff's case rests upon ownership or right of property, which must be established.  2 Greenleaf, Ev. (15th Ed.) § 120; Janes v. Buzzard, Hempst. 240, Fed. Cas. No. 7,206a.

. But conceding a right and duty to here consider the alleged fraud in taking down the common shares and substituting the preferred, and conceding that such fraud was established, and then giving to it the force and effect which it would be entitled to receive in an action ex delicto, still there would be no ground for recovery, because no damage is shown in that transaction.  We cannot assume that the common shares (ex dividends) were more valuable than the preferred at the time of the exchange.

As the amount awarded to the complainant by the decree below exceeded what it was entitled to recover there must be a reversal, with costs to appellant and a remand of the cause with direction to enter a decree for complainant for an amount to be ascertained as pointed out in the opinion of this court.

## On Petition for Rehearing.

The motion for rehearing complains of our opinion and conclusions as to two matters, viz.:  First, the dividend of $125,000 declared on the ten thousand shares of common stock on the 23rd day of December, 1908, and, second, the five dividends ($56,000) declared on the preferred shares, both of which we held appellee was entitled to receive.

1. As to the first.—The claim is that appellant was entitled to retain the $125,000 dividend on the common stock by reason of the fact that on December 12, 1908, eleven days before that dividend was declared, Perry appeared at the office of the trust company in New York and made the arrangement by which it was agreed that there should be an exchange of collateral; and therefore it is insisted

that dividends declared after that date could not be recovered by appellee. But the exchange was not made at that time, as we pointed out. Perry returned to St. Louis. The ten thousand shares were held by the trust company in New York as a pledge on the Nicholson note until December 26th, three days after the declaration of the dividend. The trust company waited until it received the preferred stock before it surrendered its pledge in the common stock. The preferred shares were forwarded from St. Louis on December 23rd through the mails and by due course reached the trust company at New York prior to its surrender of the ten thousand common shares. On December 26th the trust company sent certificates for the common shares to the bank, and it received them on the 28th of that month.

We also undertook to point out that the right of the pledgee as such in the pledge continues until a surrender of the pledge, and thus we felt there was a secure basis on which the right of appellee to that dividend was rested. We are still of that mind and are not impressed with the relevancy of authorities cited in the brief to the motion, which deal with the relations between vendor and vendee.

2. As to the second.—It is true that arguments and briefs did not direct specific attention to the right of appellee to recover the five dividends declared on the preferred shares while it held them in pledge; and if we now had any impression that appellant seriously denied that these five dividends, or any of them, came into its hands, and stood ready to establish the denial by proof, we would be compelled to say that it is entitled to an opportunity to establish that fact. But we gain no such impression from the motion, brief and argument. Indeed, the position in that respect is evasive. We quote from page 21 of the argument:

"If these preferred dividends were not paid to and appropriated by appellant, it is not the intention of this Honorable Court to require the appellant to account therefor to appellee. * * * We believe that upon an accounting for this purpose appellant can make clear that it did not receive and appropriate these dividends, certainly not all of them, and but few, if any."

The element of appropriation, as here used, upon which the contention rests, is immaterial. The evident purpose is to inject, as an element of liability, the inquiry whether appellant applied to its own use all of these dividends; whereas it was and is our view that liability, under the authorities cited, turns on the question: Did appellant receive these dividends with knowledge of the rights of the pledgee? At the time all of these dividends were declared, and for a long time theretofore, appellant, through a board of directors selected at its dictation and consisting of its officers and employés (except a small minority), had control of and managed the cement companies, had extended them large credits, had further extended its credit to Nicholson, had these preferred shares as collateral, with other of his stocks, on his indebtedness to it, and had on its book an account, under the requirements of the contract of January, 1907, entitled "George E. Nicholson Trustee Account," into which the dividends on the common shares were required to be put, with

power in Perry or his successor in trust representing the bank to check them out. In short, the bank had absorbed the whole venture and Nicholson had drifted to the position of a mere puppet. It had had these preferred shares up to the time of the exchange as collateral on Nicholson's indebtedness to it, and as the dividends thereafter declared on these preferred shares while the trust company held them were not paid over to the trust company by the cement company, it is not possible to conceive, in the light of the facts, that anyone else than either Nicholson or the bank received them from the cement company. And as it is not claimed that the cement company paid them to Nicholson, we felt, and still feel, that the only possible and reasonable inference is that they went into the hands of the bank; and when it took them, it, of course, did so with full knowledge of the rights of the trust company to have them. It was then liable to the trust company and could not relieve itself from that liability by passing them over to someone else. So that in the light of the record we reached the conclusion that appellant should account for these dividends, and that conclusion has not been shaken by the arguments presented on the motion for rehearing, but rather confirmed.

The motion is therefore overruled.