BRAND, Banking Com'r, v. FALVEY et al.

No. 2977.

Court of Civil Appeals of Texas. Beaumont.

July 9, 1936.

Rehearing Denied July 20, 1936.

Wm. J. Berne and Charles L. Morgan, both of Fort Worth, and Morris & Darden, of Conroe, for plaintiff in error.

John & Levy, Wm. N. Bonner, and Sewell, Taylor, Morris & Garwood, all of Houston, J. J. Collins, of Lufkin, Dean & Humphrey, of Huntsville, Ball & Seeligson and R. L. House, all of San Antonio, Llewellyn & Dougharty, of Liberty, Pitts & Liles, of Conroe, and Bonner, King & Dawson, of Wichita Falls, for defendants in error.

WALKER, Chief Justice.

The Farmers & Merchants State Bank of Conroe, Tex., was organized in June, 1920, with a capital stock of $65,000. The bank continued in operation until October 17, 1930, when it was closed by the banking commissioner and is now under his control. Dr. Thos. S. Falvey organized the bank, owned a majority of its stock, and was its president and one of its directors from the day it opened to the day it closed. On May 11, 1921, the board of directors fixed Dr. Falvey's salary as president at $100 per month; this action was ratified by the stockholders on the 6th of January, 1922; the record does not show that this order was ever changed. Shortly after the bank was organized, the board of directors passed a resolution in writing giving Dr. Falvey a line of credit of $10,000. When the bank was organized and during all the time it was open for business, Dr. Falvey was a man of more than ordinary wealth; he owned about 11,000 acres of land in Montgomery and the surrounding counties and had money on deposit in at least three other banks. For the recited cash consideration of $2,700 paid by Dr. Thos. S. Falvey, and the assumption by him of $2,100 in delinquent taxes against the land, by deed dated the 26th of November, 1927, and filed for record on that date, Miss Ora Lee Barclay sold and conveyed to Dr. Thos. S. Falvey "a certain 960 acre tract of land heretofore on the 3rd day of September A. D. 1892 conveyed to Ora Lee Barclay by her mother, Mary C. Barclay, which said deed is recorded in Vol. 11, page 570 of the deed records of Montgomery County, Texas, to which said deed and the records and the recitals therein contained are herein referred to and made a part hereof for full and complete description of said land." Dr. Falvey paid the delinquent taxes against the land. He paid the "cash consideration" to Miss Barclay by check:

"Counter Check

Farmers & Merchants State Bank 88—1925 of Conroe, Texas

Conroe, Texas 11/26 1927 No. ——

Pay to the

Order of Miss O. L. Barclay $2700.00

Two Thousand Seven Hundred no/100 Dollars

Bal on 960 A Land        Thos. S. Falvey

Taxes 2100.00

2700.00 Bal Pay

4800.00"

Indorsed across face: "Purchase Gowan Harris 960 A Land"

Indorsed on back: "Miss O. L. Barclay"

Canceled by bank: "Paid, 11–29–27. 88—1925."

This check was delivered by him to Miss Barclay on the day of its execution. She presented it for payment immediately to the Farmers & Merchants State Bank and it was duly accepted in the following manner: The bank paid to Miss Barclay $100 in cash and gave her a deposit slip for $2,600. When this check was presented for payment, Dr. Falvey had on deposit with the bank the sum of $262.12. The 26th of November, 1927, was Saturday. The check was carried by the bank as a cash item from the time it was deposited to the following 29th day of November, at which time, at the request of the bank, Dr. Falvey executed his note to the bank for $2,700. On that date, after the execution of the note, the bank stamped the check, "Paid 11/29/27," and on that date his account was charged with $2,700. On the back of the $2,700 note was the following notation: "This note has been approved by the board of directors 12/9/27 Sec'y J. M. G." The note also bears the number 197. The minutes of the meeting of the board of directors of April 20, 1928, for the first time included the name of Dr. Falvey in the list of "Officers and Directors ...... Indebted to the Bank, and listed opposite his name was 'Note #197,' dated '11–29–28,' showing a balance then due of $2,509.55." The bank's books showed that many and various amounts were loaned to Dr. Falvey from the 29th of November, 1927, to the 14th of October, 1930; that on the 6th of May, 1930, he owed the bank $4,500; that all amounts due by Dr. Falvey to the bank were paid in full.

On the 23d of November, 1934, appellant, E. C. Brand, banking commissioner, instituted this suit in trespass to try title against appellees Dr. Thos. S. Falvey and certain parties holding under him, to recover the title and possession of the 960 acres of land bought by Dr. Falvey from Miss Barclay. By a third amended original petition appellant pleaded his cause of action as a constructive trust against Dr. Falvey and those holding under him. It was the theory of this petition that Dr. Falvey committed a fraud upon the bank by drawing a check in payment of the land without sufficient funds on deposit to liquidate the check; that, as president of the bank, his act in drawing the check was unlawful and amounted to a misappropriation of the bank's funds; that, immediately when the check was accepted, the title to the land became vested in the bank as cestui que trust. Of the answer of appellees it is sufficient to say that they pleaded general demurrer, general denial, plea of not guilty, etc.

E. C. Brand, banking commissioner, was only nominal plaintiff. He sold the interest of the bank to Geo. B. McCamey by contract evidenced by the following letter, approved by the district court of the ninth district:

"Fort Worth, Tex., April 12, 1935.

In Re: E. C. Brand, v. T. S. Falvey et al., No. 17980, Montgomery County District Court.

"Hon. E. C. Brand, Banking Commissioner of Texas,

"Austin, Texas.

"Dear Sir:

"I will thank you to please consider the following offer for all of the right, title and interest or claim of Farmers and Merchants State Bank (in liquidation) against all of the right, title and interest of Thos. S. Falvey in and to what is known as the Gowan Harris Survey of 960 acres, more or less, located in Montgomery County, Texas, described in Patent from the State of Texas to Heirs of Gowan Harris and C. B. Stewart recorded in Vol. T, page 283, of the deed records of Montgomery County, Texas.

"1. The sum of Five Thousand Dollars cash upon delivery to me of valid legal assignment or transfer of all rights claimed by you as liquidating agent in the foregoing suit or growing out of the claims made by you in said suit.

"2. The sum of Three Hundred Dollars per acre, payable out of 1/16 or 7/8ths leasehold or working interest of oil ......

"I make this offer with full knowledge and notice of your suit against T. S. Falvey and the cross action therein recently brought by the heirs of J. M. Turner and heirs of Lockhart and Stoppel, and with full knowledge of the outstanding mineral interests claimed by Alpha Petroleum Company and other royalty and mineral interests conveyed by T. S. Falvey, also the suit of Ora C. Barclay v. Thos. S. Falvey, et al., No. 17784 in the District Court of Montgomery County, the suit of Fred Strang v. Thos. S. Falvey et al., No. 13666 in the 68th District Court of Dallas County, and the various other law suits, powers of attorney and claims filed in Montgomery County by various parties too numerous to mention. I understand that henceforth it will be my responsibility to litigate these various claims and causes and endeavor to clear this title and you understand that I cannot develop this property and start the accountings on your oil payments until I have cleared the title.

"Henceforth, I assume all expense of litigation, attorney's fees, Court costs and the like. I understand further that this offer has to be approved by you and the District Court of Montgomery County. If it is acceptable please notify me or my attorney, Charles L. Morgan, at Fort Worth, Texas.

"Respectfully submitted,

"Geo. B. McCamey

"By Charles L. Morgan,

"Agent and Attorney in Fact."

The appeal is from the judgment in favor of appellees, rendered upon a verdict instructed in their behalf by the lower court.

Supplementing the statement made above, we take the following summary of the testimony of certain witnesses from appellees' brief:

Dr. Falvey testified, in substance:

"That he had practiced medicine in Montgomery County for 35 years; he helped organize the Farmers & Merchants State Bank and was its president; the bank was closed by him in 1930, after making certain discoveries; he wired the banking department when he closed it and turned it over to the Department of Banking for liquidation.

"He understood at the time the bank was organized and he became president that he should have and did procure authority from the board of directors to borrow money. He became indebted to the bank from time to time during the years of its existence and paid every dime of all of it before it closed.

"Judge Strode, County Attorney, had an office near Falvey's and came there one day and asked if he wanted to buy a piece of land, at $5.00 per acre; that he thought it was a good buy at that price and in about 3 days closed the deal, and gave Miss Barclay his check for $2,700 on the Farmers & Merchants State Bank; Miss Barclay lived in San Benito, Texas, and he did not know she would try to cash the check on that day, and the first time he knew about the check being at the bank was a few days later when Griffith, called him he had an overdraft and to come over and see about it. He immediately signed a note for $2,700. The check showed a complete description of the land and the price across its face.

"At the next meeting of the board of directors, December 9, 1927, he was present and his note was approved by all the directors. He did not keep the books and did not know why his name was not included in the list of officers and directors indebted to the bank; and never read the minutes before he signed them as president, merely signing them at Griffith's direction, and sometimes two or three minutes of meetings would be signed at one time.

"He never tried to conceal from the board of directors the fact that he was indebted to the bank. He owned a majority of the stock in the bank and the directors were his friends, and he told them about the piece of land he had bought on the night the loan was approved, sending Oualline, one of the directors, out to caliper the timber; it was common knowledge among the members of the board that Falvey owned the land. He had discussed the matter with some of them while the title was being examined.

"He had no intention of receiving title for the benefit of the bank, and no member of the board of directors claimed title. He was a figurehead in the bank and was engaged in actively practicing medicine and there were times when he would not go to the bank at all for a week or ten days. He attended all directors' and stockholders' meetings.

"He paid the taxes on the Gowan Harris Survey which he assumed as a part of the purchase price.

"Before the bank was closed some of the records were destroyed by a fire, with which he had nothing to do.

"He never tried to hide the purchase of the land from anyone. The deed was recorded on the same day the land was purchased and the Conroe Courier, a newspaper published and widely circulated in Conroe, on December 2, 1927, carried in its issue under the heading 'Real Estate deals and oil lease list' seven or eight such deals and included 'Miss Ora Lee Barclay to Thos. S. Falvey, Gowan Harris Survey, 960 acres, $4,800.00.'

"That he frequently borrowed money from the bank and all of his loans were negotiated with the full knowledge, consent and approval of the board of directors, and the board of directors knew of and approved the loan of $2,700. at its regular meeting on December 9, 1927, when they unanimously approved the loan.

"Early in the existence of the bank the board of directors gave him unanimous authority by written resolution authorizing him to become indebted to the bank at all times thereafter to the extent of $10,000; that he never exceeded that amount of indebtedness and believed that authority sufficient for him to borrow money up to that amount without calling on the board for a special resolution on each loan.

"During that time he had accounts in the Lufkin National Bank, the Houston National Bank and First National Bank of Cleveland and had funds available with which he could have paid his indebtedness to the bank at any time. That he once asked a bank examiner named Davis if loans to the officers and directors of the bank were objectionable and Davis said not as long as they had money above their reserve and if they were able to pay the loans it was perfectly all right.

"At the time he purchased the land it was not worth what he paid for it and he tried to sell it for $3.00 per acre after he found that the timber had been stolen, as the principal reason he bought it was to get the timber.

"On January 1, 1928, he received a check for $10,000 from an interest he had in Cochran James Company. That at that time he owned eight or ten thousand acres in Montgomery, San Jacinto and

162

Liberty Counties, and still owned considerable land, but that the Gowan Harris land was the only land that had become valuable by reason of the discovery of oil, and he had not been sued for any of the poor land on which no oil had been found.

"That it cost many thousands of dollars to drill the oil wells on the land and the Banking Commissioner had not offered to pay the cost of drilling nor repay the $2,700 nor the amount he had paid for taxes.

"Following the failure of the bank Falvey had a complete audit of the books of the bank made by O. Currin & Co., of Dallas, and the Banking Commissioner also made an audit.

"He identified a check for $190.45 to Farmers State Bank, signed by Falvey, bearing notation 'to apply on note given for payment of Gowan Harris land', dated March 2, 1928, which was handled by the bank in the usual way and those running the bank could see check and know what it was paying for. There was a credit on the note dated March 3, 1928, for $190.45, the amount of the check.

"After closing of the bank and investigation by State Bank examiners the State Banking Commissioner wrote Falvey on November 20, 1930, a letter stating that their investigation reflected no discredit on Falvey and they had no reason to doubt his honesty or integrity. He also identified a letter from O'Currin & Co., auditors for the State Banking department, dated November 14, 1930, stating that at conclusion of investigation they can say that Dr. Falvey was in no way responsible for the destruction of the records nor the condition of the bank.

"He identified another check for $260, dated 7/2/28, bearing a notation that it was in payment of note borrowed on 11-29–27, to purchase Gowan Harris Survey, which amount corresponded to a credit on the back of the note on the same day.

"He borrowed $5,000 from Judge Crawford and used it to pay his indebtedness to the bank on May 6, 1930, and after that time the bank loaned him other amounts but his entire subsequent indebtedness was likewise fully paid on October 11, 1930.

"That in March, 1928, he made a loan of $5000 to one Lewis. He identified check on First National Bank of Cleveland given in payment of indebtedness to bank, dated January 13, 1930, for $500; another for $400 dated January 17, 1930;

another for $1,000 dated October 4, 1930; another for $1801.47, one for $3055.22.

"That he could borrow any amount of money he desired up to $5,000 from the First National Bank of Cleveland without security; that he could borrow $7,500 from the Houston National Bank at Houston at any time during that period; that he had paid all of his indebtedness to both banks named and there was no bank from which he had borrowed during that time that had not been repaid all of its indebtedness before 1930 or 1931. He had an account in the Lufkin National Bank, and another in the First National Bank at Conroe. He had one account in his own bank designated as a 'tithe' account in which he kept ten per cent of his income for charitable purposes. He had another account in his daughter Sue's name and one in his own name, all of which were known to the officers of the bank."

R. L. Porter, the vice president of the bank, testified in substance:

"He became connected with the bank August 29, 1927, and was in active charge of its affairs with Mr. Griffith. Dr. Falvey was active in the work of the bank only to the extent of giving advice and attending directors' meetings. Falvey did not work in the bank, and Porter principally handled the loans of the bank. Mr. Griffith wrote the minutes, but he did not remember whether the minutes were ever actually read since the directors were familiar with the proceedings included in the minutes and the minutes were not taken into serious consideration. Mr. Griffith had the duty of listing in the minutes the indebtedness of the officers, and that he never knew or had information that Dr. Falvey requested him or Griffith to fail to include his indebtedness in the list.

"Dr. Falvey's notes were submitted to the board of directors at the regular meetings for their approval or disapproval, and they always approved them. The board allowed Dr. Falvey a line of credit of $10,000 at all times. The loan of $2,700 made on November 29, 1927, was at the next meeting, held on December 9, 1927, submitted to the board of directors for their approval and it was by them approved. The custom of the bank in such matters was for the secretary of the board to stamp on the back of the notes when they were approved and initial them. He placed the stamp on the notes as they were read off. It was in

that way that he placed the stamp on Dr. Falvey's $2,700 note at the meeting of the December 9th, when the directors approved the note.

"He as vice-president of the bank knew at all times that Dr. Falvey had purchased the Gowan Harris land from Miss Barclay with the funds borrowed, and Dr. Falvey told them at the time they approved the loan that he had bought a piece of land with the money. All of Dr. Falvey's dealings with the bank were open and aboveboard.

"Neither he nor any other member of the board of directors ever asserted any claim for the bank to the land, and the bank was not buying and selling land, as they were not in that sort of business.

"The fact that Dr. Falvey's name was not included in the list of officers and directors indebted to the bank was probably due to oversight in writing up the minutes, as very often the secretary would look on the previous minutes for indebtedness instead of going to the ledger. In the minutes of the meeting of December 9, 1927, Dr. Falvey's note, #197, was included in the list of notes from 128 to 234 which were reported as 'gone over and approved'. He knew of no reason why Dr. Falvey would not have wanted his indebtedness recorded along with the indebtedness of the other officers of the bank."

E. A. Oualline testified:

"That he became connected with the bank in 1924, and had stock in it since its organization. He became a director in 1926, and attended most of the directors' meetings.

"He recalled being present at a meeting when the board passed on the loan of $2,700 evidenced by the note of November 29, 1927, to Dr. Falvey, and it was passed on in regular form like the rest of the notes and approved at the meeting.

"He knew the $2,700 Dr. Falvey borrowed at that time was used to buy the Gowan Harris tract from Ora Lee Barclay. Just before or just after Dr. Falvey bought the land he went out at Dr. Falvey's request to inspect the timber on the land, and recommended the transaction because of the timber that was on the ground and it was a good investment. All Dr. Falvey's loans from the bank from that time until it was closed were

approved and ratified by the board of directors.

"It was common knowledge that Dr. Falvey had been authorized by the board of directors to borrow up to $10,000.

"The Farmers & Merchants State Bank never asserted any claim to the land before the bank closed, and did not want the land.

"The note was paid in full to the bank and the bank accepted the funds in satisfaction of the debt at a time when they knew the land had been purchased therewith. The bank did not demand or want Dr. Falvey to give them the land instead of the money."

J. M. Griffith testified in substance:

"That he had been cashier of the bank since its organization in 1920, until it closed in 1930.

"Early in its organization the board of directors had discussed the propriety of extending to Dr. Falvey the right to borrow money from the bank and a resolution was passed and adopted authorizing him to borrow up to $10,000, which resolution was reduced to writing and spread upon the minutes and records of the bank.

"He knew when Dr. Falvey purchased the Gowan Harris land and knew at the time he got it and at all times thereafter that the $2,700 Dr. Falvey borrowed from the bank was used to pay for the land. The $2,700 borrowed together with all interest was paid by Dr. Falvey to the bank, and at that time he knew Falvey had bought the land with the money, and that it was common knowledge and all the directors knew it."

In addition, J. M. Griffith, on cross-examination, testified emphatically that Dr. Falvey's authorization to borrow $10,000 was evidenced by written resolution:

"Q. It was reduced to writing and recorded on the minutes? A. Yes sir, in the minutes.

"Q. And it wasn't then a verbal agreement between the directors and Dr. Falvey that he was to have that line of credit? A. It was brought up in the meeting. Dr. Falvey brought it up himself and it was unanimously adopted.

"Q. At a regular meeting of the board of directors? A. At a regular meeting of the board of directors, yes sir.

"Q. And presumably it was recorded in those minutes at that time? A. Yes sir."

And on redirect examination by defendants' counsel Collins:

"Q. Was the resolution which the board passed authorizing a line of credit to Dr. Falvey up to $10,000 ever revoked from the time it was passed until the bank closed? A. No sir.

"Q. Did the board of directors from time to time following that at all times recognize that resolution and approve Dr. Falvey's loan in every respect? A. Yes sir.

"Q. Was that note of Dr. Falvey's immediately posted on the ledger after it was executed by the doctor? A. Yes sir.

"Q. Was it accurately kept on that record from day to day at all times until it was paid by the doctor? A. Yes sir.

"Q. Was that available to the bank examiners when they came to examine the books? A. Yes sir.

"Q. Was the note kept in the note case with the other notes in uniform manner and was it available to any of the directors who cared to examine the note case? A. Yes sir.

"Q. I will ask you to state whether or not Dr. Falvey or any other person requested you or Porter to conceal from the directors any of the transactions of his with the bank at that time? A. No sir.

"Q. Were any of his relations ever concealed from the board of directors? A. No sir.

"Q. According to his liability ledger sheet he paid the bank all that he owed them and had a clean slate on May 6, 1929? A. Yes sir."

William I. McMaster testified in substance:

"That he had lived for twenty years in Montgomery County and was a stockholder in the bank at its inception and several years later became a director, at which time Dr. Falvey was president. He generally attended the directors' meetings.

"He remembered very clearly the bank loaning Dr. Falvey $2,700 in November, 1927, and knew all about what the loan was made for. The note was later paid by Dr. Falvey and at that time the directors knew he had bought the land with, and did not demand that he give them the land instead of the money, as the cash was what they wanted.

"After that Dr. Falvey borrowed money from time to time from the bank and all his loans were approved by the board of directors. No objection was ever made by the members of the board to Dr. Falvey's line of credit. The bank wanted Dr. Falvey's patronage, as it was a benefit to the bank.

"He knew about and approved a resolution which had been passed before he became a director authorizing the bank to extend to Dr. Falvey a line of credit up to $10,000.

"During all the time he was a director in the bank, Dr. Falvey's relations with the bank were satisfactory to the board.

"That during the three days the title was under examination he had been upon the land with his instrument (doodle bug) and had found and reported to Dr. Falvey that the land would probably produce oil."

#### Opinion.

The judgment of the lower court must be affirmed for the following reasons:

First. The facts negative every possible theory upon which appellants could claim a constructive trust for the land in controversy. Quoting 65 C.J. 454: "Fraud, actual or constructive, is an essential element in the creation or existence of a constructive trust, and no such trust arises, where there are no circumstances which make it inequitable for one to hold absolute title to property against another." Again, same volume, page 482: "Unauthorized use of principal's funds or property. Where an agent employs the money or property of his principal in the purchase of lands, without the consent of the latter, taking the title in his own name or in the name of a third person, a trust of the legal estate will arise by operation of law; * * * It is essential, however that the use of the principal's money for this purpose, or the taking of title by the agent in his own name or in the name of a third person, should be unauthorized or fraudulent; and so where, after the agent has purchased lands with the principal's money and has taken title in his own name or in the name of a third person, the principal ratifies and confirms such transaction, such ratification has the effect of a previous authorization for such purchase, and a constructive trust in such lands will not arise in favor of the principal, there being no want of authority on the part of the agent to make

the purchase nor fraudulent use of the principal's money." In this case there was no fraud. Active Vice President Porter and Cashier Griffith knew that Dr. Falvey was going to buy this land; they knew that he would draw his check on the bank in payment of the land, and that he did not have enough money on deposit to cover the check; with this information they promised to take care of the check when it was presented. Some of the directors knew that Dr. Falvey was negotiating to buy the land before it was bought, and that he was buying it for himself and not for the bank. When the check was drawn the board of directors had given Dr. Falvey a line of credit of $10,000. He had on deposit with other banks funds sufficient to cover this check had the bank officers demanded payment of him on the day the check was presented. The facts and circumstances in the record negative affirmatively every imputation of fraud against Dr. Falvey and against the officers of the bank, in relation to this transaction. But, on the contrary, every circumstance in the record establishes affirmatively and beyond question their good faith.

In point, sustaining Dr. Falvey in his right to draw this check and his good faith in drawing it, we quote as follows from the opinion of the Commission of Appeals in Shaw v. McShane, 50 S.W.(2d) 278, 281:

"The preceding article [art. 527, Rev. Civ.Sts.] expressly prohibits any officer of a state bank from becoming indebted to the bank in any sum without the consent of the board of directors.

"In taking the bank's money and paying it to Tayloe, Shaw evidently had no intention to misappropriate the bank's funds or to make a loan prohibited by law. The giving of his own personal note at the time clearly indicates that he intended to borrow the money upon his own credit and that of the directors, and not upon the credit of Garland. Although Shaw was an officer of the bank, he had a right, with the consent of the other directors, to borrow from the bank. While there is no evidence of the entry of a previous order by the directors, allowing Shaw to borrow money from the bank, the approval of the directors given afterwards is sufficient."

On that very point, in Fort Worth National Bank v. Harwood, 229 S.W. 487, 489, the Commission of Appeals said: "General power to draw drafts on a bank's funds may be expressly given to the president by the board of directors, or it may be conferred by established usage. Morse on Banks & Banking (5th Ed.), vol. 1, § 144. The exercise of the general power by the president is assumed to be lawful in the absence of opposing facts. If no restriction is placed upon the power of the president, he has the same authority to issue drafts in payment of his personal debt as he has to issue them to strangers. In both instances the power to issue is conditioned upon the bank's being paid for the draft, and in neither instance does the authority to issue the draft exist where payment is not made. When an officer having authority to issue the bank's drafts issues a draft in payment of his individual debt, it must be presumed either that it is misappropriation of the bank's funds, or else that the officer has paid, or will pay, the bank for the draft. If the presumption that the officer is guilty of misappropriating the funds be indulged, then the duty to make inquiry as to the bona fides of the transaction arises as a matter of law, but not otherwise. The presumption of honesty, rather than dishonesty, on the part of an officer clothed with authority, should be indulged."

McIlroy Banking Co. v. Dickson, 66 Ark. 327, 50 S.W. 868, 869, by the Supreme Court of Arkansas, is in point on the facts of this case denying the power of the court to construct a trust against the land in controversy. In that case the court said: "It is contended, however, in this connection, that the money expended in building Dickson's residence was a portion of the trust fund of the bank in his hands and under his control at the time, and that the same can be followed into the building, and the latter made subject to its repayment to the bank. The facts of this part of the case are these: That Dickson was the owner by inheritance of the lot of ground upon which the residence was erected; that he expended in the erection of the building the sum of $1,801.50, which was paid out to workmen, material men, and laborers from time to time, in small amounts, on checks drawn by Mrs. Lelia Dickson, the wife of J. L. Dickson, as he stated, in order to keep that separated from his other accounts; and, after the completion of the building, it ap-

pears that Dickson paid, in cash or its equivalent, on this $1,801.50 due the bank, the sum of $951.50, and gave his note for the balance ($750), which note, however, the plaintiff says it has been unable to find. There does not appear to have been any secrecy or concealment connected with this transaction. Everything seems to have been open to the inspection of the directors and other bank officials. This being the case, the money so drawn out and expended on said building constituted rather a loan in the usual way, from the bank, than a misuse of trust funds; for, in incurring an indebtedness by checks on a bank in the usual way, even where one overdraws, the drawer does not ordinarily make himself a trustee to account as such for the amount drawn out, and in the absence of secrecy, as we have said, we think this was no trust fund. Besides, Dickson, all this time, had $3,500 worth of stock to his credit in bank, to answer for any overdraft he might make. It follows, therefore, that the homestead cannot be reached and made subject to the overdraft, as is sought to be accomplished in this case."

On the undisputed facts neither the Farmers & Merchants State Bank, nor the banking commissioner, ever had the right to claim a trust against Dr. Falvey in respect of the property in controversy.

Appellants insist that the failure of the minutes of the bank from 11/29/1927 to April 20, 1928, to reflect the loan to Dr. Falvey raised an inference of fraud. On the undisputed facts this contention is without merit. The testimony quoted above gives a reasonable explanation for the failure of the minutes to make any reference to Dr. Falvey's loan. The undisputed testimony negatives affirmatively any motive of fraud or willful concealment by the board of directors.

■ Second. But, if the bank ever had the right to claim a constructive trust in respect of the land in controversy, that right was lost by its affirmative ratification of the acts of its officers, Vice President Porter, and its cashier Griffith, in making the loan to Dr. Falvey. As stated above, these officers knew that Dr. Falvey was buying the land and would draw his check on the bank in payment of the land and that he did not have money enough on deposit to cover the check;

these facts were also known to certain other directors. After the officers of the bank accepted Dr. Falvey's note on the 29th day of November, 1927, the directors of the bank met on the 9th day of December, and, knowing all the facts, approved the loan and gave Dr. Falvey's note the No. 197, and examined and approved all loans from loan No. 108 to loan No. 234. The note thus executed and delivered by Dr. Falvey to the bank was by him in all things paid. Not a circumstance of the transaction was concealed by Dr. Falvey from the officers of the bank. These facts constituted ratification by the bank of the act and conduct of its officers in making the loan to Dr. Falvey. Keyes v. First National Bank (D.C.) 20 F.(2d) 678, affirmed (C.C.A.) 25 F.(2d) 684, certiorari denied, 278 U.S. 633, 49 S.Ct. 31, 73 L.Ed. 550; 6 Tex.Jur. 129; 10 Tex. Jur. 991, 992, pars. 332, 333. We quote paragraph 335: "Ratification is tantamount to, and has the effect of, prior authority. Its effect is to cancel any objection arising from the absence of the requisite authority."

■ Third. But if we should be wrong in both the conclusions discussed above, then for a third reason the judgment must be affirmed; appellants' cause of action for a constructive trust, if any he had, was barred by the statutes of limitation. There was no concealment of the facts of this transaction. The board of directors knew of the loan, of the advancement made to Dr. Falvey, and of the use made by him of the money advanced to him, at least by the 9th of December, 1927, more than seven years before this lawsuit was filed. In Wilson v. Simpson, 80 Tex. 279, 16 S.W. 40, 42, our Supreme Court said: "In cases of resulting trusts, where the trust is admitted, and there is no adverse holding, no lapse of time affects the beneficiary. In constructive trusts, which presuppose an adverse right from the beginning in the trustee, limitation will run from the time the beneficiary should have vindicated his right of action." See, also, Bremond v. McLean, 45 Tex. 10; Mexican National Coal Co. v. Frank (C.C.) 154 F. 217, and the Texas authorities cited therein.

For the three reasons stated above the judgment of the lower court is in all things affirmed.